UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IRA CHERNICK as Administrator of the Estate of
MARYANN OST CHERNICK,

                      *Plaintiff*,

-against-

POLICE OFFICER JESUS FAYA, POLICE
OFFICER ARGAND REYES, POLICE OFFICER
MICHAEL SWEET, POLICE OFFICER CHARLES
TRAMONTANA, individually, OFFICERS "JOHN
DOE" 1-2 (fictitiously named) individually, and THE
COUNTY OF SUFFOLK,

                      *Defendant.*

19-CV-7093 (ARR) (ST)

**OPINION & ORDER**

---

ROSS, United States District Judge:

    Plaintiff Ira Chernick brings this action on behalf of the estate of his late wife, Maryann Ost Chernick ("Mrs. Chernick"), against the County of Suffolk and individual Suffolk County police officers Jesus Faya, Argand Reyes, Michael Sweet, and Charles Tramontana (collectively, "defendants"), alleging that defendants violated Mrs. Chernick's constitutional rights during an arrest. Pursuant to 42 U.S.C. § 1983, plaintiff brings a claim for excessive force against the individual officers and a claim for municipal liability against the Suffolk County. Defendants now move for summary judgment. For the reasons set forth below, I grant the motion in part and deny it in part.

**BACKGROUND**[1]

    On the night of February 9, 2019, Mrs. Chernick was visiting a friend in Deer Park, New

---

[1] The following facts are derived from the parties' depositions, exhibits, memoranda, and respective Local Rule 56.1 Statements of Facts. *See* Defs.' Mem. Supp. Summ. J., ECF No. 75-15 ("Defs.' Mem."); Defs.' Rule 56.1 Statement, ECF No. 75-2 ("Defs.' 56.1 Statement"); Pl.'s Mem. Opp'n Summ. J., ECF No. 78-3 ("Pl.'s Opp'n"); Pl.'s Response to Defs.' Local Rule 56.1

York. Defs.' 56.1 Statement ¶ 163. On her way home, she stopped at a local CVS. *Id*. According to a witness named Jenisse Reynoso, Mrs. Chernick exited the CVS around 11:40 P.M., entered a black truck, turned on the truck, and, after realizing that she had dropped something outside, exited the truck while the engine was still running. *Id*. ¶ 20–21; Sworn Statement Jenisse Reynoso, ECF No. 75-13 ("Reynoso Statement"). The truck, which was still in reverse, began moving backwards until it collided with the CVS building. *Id*. There was no visible damage to the building. Defs.' 56.1 Statement ¶ 18. Mrs. Chernick then reentered the car and drove off, at which point Reynoso called 911. Reynoso Statement; Defs.' 56.1 Statement ¶ 14. Two Suffolk County Police Officers, Ronald Treanor and Argand Reyes, responded to a call from dispatch regarding the collision. *Id*. ¶ 9, 14–16, 23. Officer Treanor was the first to arrive at the scene, where he surveyed the building for damage and, seeing none, took a sworn statement from Reynoso. *Id*. ¶ 20–21; Dep. Ronald Treanor 23–31, ECF 75-11. Officer Reyes also visited the CVS briefly and spoke separately to Reynoso. *Id*. at 150; Argand Reyes Dep. 42–46, ECF No. 76-3. According to Reyes, Reynoso told him many of the same facts that she told Officer Treanor, but added that she saw Mrs. Chernick fall out of the vehicle while it was backing up. *Id*. at 95–101. That additional detail is not reflected in Reynoso's sworn statement that is contained in the record. *Id*. at 99, *see also id*. at 123–25, 137–38.

  Around the same time, a different Suffolk County Police Officer named Charles Tramontana received two radio dispatch transmissions regarding a car striking a building in the area. Defs.' 56.1 Statement ¶ 25; Dep. Charles Tramontana 22–24, ECF No. 76-1. After seeing a

---

Statement, ECF No. 78-3 (Pl.'s 56.1); Defs.' Reply Supp. Summ J., ECF 77 ("Defs.' Reply"). Unless otherwise noted, the facts as recounted here are undisputed. All evidence is construed in the light most favorable to plaintiff as the non-moving party. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

"dark SUV" pass by, Officer Tramontana transmitted a message indicating that he had identified a vehicle matching the description, advised of his location, turned on his emergency lights and sirens, and attempted to pull the driver over. Defs' 56.1 Statement ¶¶ 27–29, 32. The vehicle turned out be a black Lexus driven by Mrs. Chernick. *Id.* ¶ 32. After Mrs. Chernick refused to pull over, Officer Tramontana followed her onto the Long Island Expressway ("LIE") traveling westbound, at speeds up to 70 miles per hour. *Id.* ¶ 28, 43. Several other officers, including Officer Reyes, Jesus Faya, and Michael Sweet joined the chase after hearing Officer Tramontana's radio transmissions. *Id.* ¶¶ 30, 38–40, 60–61.

Despite the growing fleet of police vehicles chasing her, Mrs. Chernick refused to stop for approximately thirteen miles, Defs.' Mem. 10, and eventually exited the LIE in Nassau County. Defs.' 56.1 Statement ¶ 33, 44. Once off the LIE, Mrs. Chernick drove towards her home, located in a gated community called the Hunt Club, where she crashed through the guard gate, parked in her driveway, and exited the vehicle. *Id.* ¶¶ 46, 51, 56. Officers Tramontana, Reyes, Faya, and Sweet pulled up behind Ms. Chernick and also exited their vehicles, *Id.* ¶¶ 52–55, 64. Mrs. Chernick ran to her garage door and attempted to enter the numbers on the keypad while the officers approached her on foot. ¶ 59, 65.

The parties dispute what, exactly, happened when the officers reached Mrs. Chernick. According to plaintiff, "Maryann . . . was forcefully thrown to the ground" and had her arm broken by the forceful twisting of one of the officers, even though she posed no threat or risk of flight. Pl.s' Opp. 3; *see* Pl.'s 56.1 Response ¶¶ 71–128. According to defendants, Mrs. Chernick vigorously resisted their attempts to place her under arrest, which required them to secure her limbs to ensure that she was not hiding a weapon. Defs. 56.1 Statement ¶¶ 78–83, 88–98, 100–110, 124–26. Eventually, the officers say they were able place Mrs. Chernick in in handcuffs,

3

using no more force than was required, noting that she did not evince any pain or injury during the encounter. *Id*. ¶¶ 85, 97, 103, 109, 112. The parties agree that, in the course of the handcuffing, Mrs. Chernick sustained multiple cuts and scrapes on her face. *Id*. ¶¶ 133, 139.

After Mrs. Chernick was handcuffed, one or more officers brought her to her feet. *Id*. ¶ 111; Reyes Dep. at 79–80 (testifying that Officer Reyes lifted Mrs. Chernick up by placing his arms "underneath her arm pits"); Faya Dep. 70–71 (testifying that Officer Faya "helped her stand" by pulling on her shirt and "put[ting] a hand on her waist"). Once she was standing, Officer Faya spoke to Mrs. Chenick and placed her into custody. *Id*. at 72–74; Defs.' Mem. 115–16. According to Officer Faya's deposition testimony, Mrs. Chernick told him during this conversation that she could not feel her right hand. Faya Dep. 71. Shortly thereafter, Officer Faya transported Mrs. Chernick to Good Samaritan Hospital, where x-rays were taken of her arm, and she was evaluated by several doctors. *Id*. ¶¶ 130–31; *see* Expert Report Dr. Jonathan Luchs 1, ECF No. 79-2 (listing x-ray dates and locations). Mrs. Chernick also consented to a blood test, which revealed the presence of five different prescription drugs. Defs.' 56.1 Statement, ¶¶ 143–44, 156; *see* Toxicology Report, ECF No. 75-8. According to plaintiff, all of those drugs were legal and were prescribed to Mrs. Chernick by her psychologist. Pl.'s Mem. 4. During her time at the hospital, Mrs. Chernick reportedly discussed the CVS collision with two different Suffolk County officers—Officer Faya and Sergeant Justin Carey—and admitted that her car did indeed strike the building. Pl.'s 56.1 Response ¶¶ 135, 140, 142. At some point, Officer Reyes also arrived at the hospital to deliver Mrs. Chernick a summons. Reyes Dep. 127–31. According to his deposition testimony, while Officer Reyes was in the hospital, he overheard Mrs. Chernick tell a doctor that she fell out of her car while discussing the injury to her arm. *Id*. at 134–37. Mrs. Chernick was ultimately charged with Driving under the Combined Influence of

4

Drugs, Resisting Arrest, Leaving the Scene of an Arrest, and at least ten traffic infractions. Defs.' 56.1 Statement ¶¶ 115, 146, 154–55, 157.

Meanwhile, back in the Hunt Club, Officer Tramontana made contact with plaintiff and informed him of his wife's arrest. *Id*. ¶ 159. Plaintiff did not see Mrs. Chernick until the he picked her up at the courthouse following her arraignment later in the morning. *Id*. ¶ 170. According to plaintiff's deposition testimony, Mrs. Chernick appeared "beat up," "was in pain," and had a "limp" arm. Chernick Dep. 80–82. Sometime that morning, plaintiff and Mrs. Chernick had a conversation about the night's events, wherein she recounted the collision at the CVS, the police chase, the collision with the guard gate, and a visit from the "police chief" while she was at the hospital. *Id*. at 82–89. She explained that she did notice the sirens on the LIE, but did not pull over because she thought the officers were chasing someone else. *Id*. at 84–85. By the time she realized the officers were chasing *her*, she was "scared out of [her] wits" and "didn't know what to do so she came home." *Id*. at 84–86. Mrs. Chernick also told plaintiff that "her arm was killing her" and that she needed to have it examined. *Id*. at 87.

Sometime thereafter, plaintiff took Mrs. Chernick to a doctor, who told Mrs. Chernick that she had a broken arm and advised her to go to a hospital. *Id*. at 91–92. According to medical records, Mrs. Chernick was later examined on February 20, 2019, at North Shore University Hospital, where additional x-rays were taken of her arm. *See* Consultation Record, ECF 79-4; Dep. Hamid Mostafavi, MD 21–23, ECF No. 79-1. According to Dr. Hamid Mostafavi—an orthopedic surgeon who examined and later operated on Mrs. Chernick—the x-rays revealed a "spiral distal" fracture, which is typically caused by "twisting force." *Id*. at 18–19. This diagnosis was confirmed by a different radiologist who reviewed multiple sets of x-rays. *See* Expert Report, Dr. Jonathan Luchs 2, ECF No. 79-2. On February 22, 2019, Dr. Mostafavi operated on

5

Mrs. Chernick and installed metal wires and screws with the goal of repairing her arm. Mostafavi Dep. 30–32.

On December 18, 2019, Mrs. Chernick filed a complaint alleging use of excessive force and municipal liability for failure to train. Compl., ECF No.1, ¶¶ 49, 64. On January 1, 2020, Mrs. Chernick passed away due to a heart attack that was unrelated to the events at issue in this case. Following her death, plaintiff was permitted to file two amended complaints: one substituting Mr. Chernick as the plaintiff in his capacity as the Administrator of his wife's estate, Consent Mot. Sub. Party, ECF 15, and the second naming officers whose identities were unknown at the outset of the case, Consent Mot. Leave File SAC, ECF No. 26. The operative Second Amended Complaint ("SAC") was filed on June 1, 2021. ECF No. 29. Following discovery, defendants now bring this motion for summary judgment on both claims.

## LEGAL STANDARD

"Summary judgment is appropriate only where the record shows 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 80 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is appropriate when "there can be but one reasonable conclusion as to the verdict." *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) (quoting *Anderson*, 477 U.S. at 255).

The party seeking summary judgment carries the burden of proving that there is no genuine dispute of material fact, and the court must draw all reasonable inferences in favor of the

6

nonmoving party. *See Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223–24 (2d Cir.1994). However, "[t]he nonmoving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

In assessing whether summary judgment is appropriate, I need only consider evidence in the record that would be admissible at trial. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009); *Sprayregen v. A. Gugliotta Dev., Inc.*, 166 F. Supp. 3d 291, 300 (E.D.N.Y. 2016). This means I may not rely on inadmissible hearsay testimony. *See Little v. Cnty. of Nassau*, 708 F. Supp. 3d 252, 264—65 (E.D.N.Y. 2023) (collecting cases). However, where the only witness testimony likely to contradict the officers is inadmissible because the witness is deceased, I need not "simply accept what may be a self-serving account by the police officer[s]." *O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003) (internal quotation marks omitted). "Rather, [I] must also consider 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.'" *Id*. (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

## DISCUSSION

Defendants move for summary judgment on both of plaintiff's claims. The individual defendants further assert that they are entitled to qualified immunity even if summary judgment is otherwise inappropriate. For the reasons set forth below, I deny summary judgment on the excessive force claim and grant summary judgement on the municipal liability claim.

## I. Summary Judgment is Denied on the Excessive Force Claim.

Defendants move for summary judgment on plaintiff's excessive force claim because, in their view, there is no admissible evidence that contradicts the officers' versions of the events. *See* Defs.' Mem. 1, 11–12.  I disagree. Even excluding those portions of the record that constitute inadmissible hearsay, there remains a genuine dispute as to the cause of Mrs. Chernick's broken arm. That is clearly a material fact that bears on whether the force the officers used was objectively reasonable. Further, the officers are not entitled to qualified immunity because the same factual disputes impact the assessment of whether the officers reasonably believed that their conduct was constitutional.

### A. Legal Principles

"The Fourth Amendment prohibits the use of excessive force in making an arrest." *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015). An officer's use of force is excessive if it is "objectively unreasonable" under the circumstances, regardless of the officers' subjective intent. *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004). In assessing objective reasonableness, relevant factors include "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously[.]" *Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016) (internal quotation marks omitted). Because an officer's "right to effectuate an arrest" entails "the right to use some degree of physical coercion," *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005), not every bump or bruise constitutes a constitutional violation. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). "When a plaintiff suffers only a de minimis injury," for instance, "it is harder for the plaintiff to establish that the force used was excessive." *McKenzie v. City of New York*, No. 17-CV-4899, 2019 WL

8

3288267, at *9 (S.D.N.Y. July 22, 2019). "[T]he existence of medical evidence that contradicts the defendants' version of events can preclude summary judgment by raising an issue of fact" as to the extent of plaintiff's injuries or the amount of force used by defendants. *Benson v. Yaeger*, No. 05-CV-784S, 2009 WL 1584324, at *4 (W.D.N.Y. June 3, 2009) (collecting cases).

Qualified immunity is a doctrine that gives officers "breathing room to make reasonable but mistaken judgements" by immunizing them from liability in cases where their conduct does not violate "clearly established" rights. *Stanton v. Sims*, 571 U.S. 3, 5–6 (2013) (internal quotation marks and citations omitted). In excessive force cases, qualified immunity may protect an officer who used objectively unreasonable force if it was objectively reasonable for him to *believe* that the force was lawful at the time of incident. *See Rodriguez v. City of New York*, 594 F. Supp. 3d 534, 545 (E.D.N.Y. 2022); *Collins v. City of New York*, 295 F. Supp. 3d 350, 362–63 (S.D.N.Y. 2018). At the summary judgment stage, courts resolve questions of qualified immunity with a "two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong is similar to the summary judgment inquiry recounted above and "asks whether the facts, [t]aken in the light most favorable to the plaintiff," show that the officer's conduct "violated a federal right." *Id.* 655–56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Assuming that there was a violation, the second prong "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.*

### B. Evidentiary Issue

At the outset, I briefly address an evidentiary dispute before considering the excessive force claim. In their briefing, the parties vigorously dispute the admissibility of plaintiff's testimony

9

regarding his conversation with Mrs. Chernick on the morning of her arraignment, which includes Mrs. Chernick's recounting of the prior night's events. *See* Chernick Dep. 82–89. Defendants argue that those statements are inadmissible hearsay and do not fall under any exception. Defs.' Memo at 12–13; *see* Fed. R. Evid. 802–804. Plaintiff counters that Mrs. Chernick's statements on are admissible as "excited utterances," made "under the stress of excitement" of the night's traumatic events. Pl.'s Mem. 23–24; Fed. R. Evid. 803(2).

I agree with defendants that Mrs. Chernick's statements to her husband are inadmissible as excited utterances. The hours that passed between the police chase and the arraignment included ample "opportunity for reflection," *U.S. v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002), such that the statements cannot be considered a "spontaneous reaction to . . . traumatic events," *United States v. Wilson*, 642 F. Supp. 3d 380, 393 (W.D.N.Y. 2022). Indeed, at the time of plaintiff's conversation with Mrs. Chernick, she had been questioned about the night's events many times by both the police and medical professionals and was aware that she was facing criminal consequences. Given this chain of events, it is reasonable to assume that Mrs. Chernick had the opportunity to reflect on the potential consequences of her words. *See Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004) (explaining that excited utterances are those made "in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation" (internal quotation marks omitted)).

The exclusion of Mrs. Chernick's testimony, however, has little impact on my assessment of the appropriateness of summary judgment. For one, the testimony in question primarily concerns Mrs. Chernick's perception of the police chase—in particular, her failure to pull over because she "didn't think that the cops were after her." Chernick Dep. 85. This information is of little relevance in assessing the reasonableness of the subsequent use of force, which is judged by

the perspective of a reasonable officer—not the arrestee. *See Graham*, 490 U.S. at 396. The other details from Mrs. Chernick's testimony, such as her description of the hit-and-run, Chernick Dep 83, and collision with the gate, *id*. at 86, concern facts that are largely undisputed by the parties. *See, e.g.*, Pl.'s 56.1 Response, ¶¶ 51 (admitting that Mrs. Chernick kept driving "[a]fter crashing through the guard gate") & 140 (admitting that Mrs. Chernick told an officer that she "hit a building" and "drove her car away"). Finally, even if Mrs. Chernick's testimony could in some way undermine the officers' claim that the use of force was objectively reasonable, it is not the only evidence that does so. There is other admissible evidence, including the testimony of two physicians familiar with Mrs. Chernick's injuries, that establish a genuine dispute regarding the cause of her broken arm. I turn to that evidence now.

### C. Excessive Force

Plaintiff's excessive force claim concerns the physical force that was allegedly used against Mrs. Chernick during her arrest following the police chase down the LIE. To assess whether the officers' force was reasonable, a factfinder must assess both the amount of force and the circumstances under which that force was deployed. A genuine dispute of material fact in either category is enough to defeat summary judgment. *See, e.g., Mazurkiewicz v. New York City Transit Auth.*, 810 F. Supp. 563, 568 (S.D.N.Y. 1993) ("[The] factual dispute over the amounts of force used, and the injuries suffered by and inflicted by the parties, bar[s] summary judgment."); *Thomas v. Roach*, 165 F.3d 137, 143–44 (2d Cir. 1999) (explaining that factual disputes over the events that proceeded arrest "implicate the reasonableness of the officers' use of force" and preclude summary judgment).

Here, the primary factual dispute concerns the amount of force applied to Mrs. Chernick's arm—specifically, whether it was broken due to the officers' force. The parties agree that,

11

immediately prior to the arrest, Mrs. Chernick was positioned face down on the ground with her arms and hands tucked beneath her waist. Defs.' 56.1 Statement ¶ 77; Pl.'s 56.1 Response ¶77. Four officers worked together to control her body, extract her hands, apply handcuffs, and bring to her feet. Defs.' 56.1 Statement ¶¶ 73–101. During this process, at least three of the officers admitted to making contact with Mrs. Chernick's arms or hands, *id*. ¶¶ 81, 93, 109, including one who testified that he "pull[ed] her arm" to "get it behind her back," *id*. ¶ 98; Michael Sweet Dep. 64, ECF No. 76-4; *see also* Jesus Faya Dep. 53, ECF No. 76 ("I grabbed her hands to pull [her to the ground]."). After she was placed in handcuffs, Mrs. Chernick was transported directly to the hospital, where x-rays taken between 2:00 and 8:00 AM revealed that she had a broken arm. *See* Luchs Report 1 (listing x-ray dates, times, and locations).

Defendants do not have a clear theory of when and how the break occurred. Their primary theory seems to be that Mrs. Chernick broke her arm earlier in the night, when she allegedly fell out of her car in the CVS parking lot. Defs.' Mem at 3, 12. The principal evidence for that theory comes from the deposition testimony of Officer Reyes, who testified (1) that Ms. Reynoso saw Mrs. Chernick fall out of the car and (2) that he overheard Mrs. Chernick tell an emergency room doctor the same thing. Reyes Dep. 107, 128–30. However, that detail is glaringly absent from Ms. Reynoso's sworn statement, *see* Reynoso Statement, ECF No. 75-13, and there is no declaration from the doctor corroborating what Officer Reynoso purportedly overheard. Additionally, two different doctors examined Mrs. Chernick's x-rays and concluded that the break was mostly caused by "twisting" force, rather than a fall. Mostafavi Dep. 18–20; Luchs Report 3. Dr. Mostafavi also testified that it would be "shocking" if somebody with Mrs. Chernick's injury was able to drive a car, which casts further doubt on defendants' theory that her arm was already broken at the time of the police chase. Mostafavi Dep. 43–44. Even if Mrs. Chernick did fall in the parking lot earlier

that night, the doctors' testimony suggests the fall might not have been the cause of her broken arm. In sum, the question of whether the break occurred during the arrest remains a disputed issue of fact.

Alternatively, defendants argue the circumstances justified "any force used in the course of Mrs. Chernick's arrest," regardless of the resulting injuries. Defs.' Mem. 2. Specifically, defendants argue that Mrs. Chernick's physical resistance, combined with the officers' perception of an "immediate threat," rendered their forcible restraint "objectively reasonable." *Id*. at 11. While it is true that resisting arrest "justifies the officer's use of *some* degree of force," it "does not give the officer license to use force without limit." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000). As the Second Circuit has explained, there is no "per se rule that an arrestee's refusal to submit to the easy application of handcuffs always permit[s] police officers to use substantial force" to accomplish the arrest. *Brown v. City of New York*, 798 F.3d at 102. Rather, "the force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan*, 225 F.3d at 166. Determining whether the force was "reasonably related" is a fact-intensive inquiry that often requires the factfinder to assess an officer's credibility and weigh the evidence supporting an officer's assertion of perceived risk. *See Mazurkiewicz*, 810 F. Supp. at 568; *Jones v. Truebig*, 963 F.3d 214, 231 (2d Cir. 2020) ("[T]he reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury[.]"). If, for example, the evidence suggests that an officer is "in control of the arrest," a jury may find substantial force to be unwarranted even if the subject is "uncooperative." *Dineen v. Stramka*, 228 F. Supp. 2d 447, 451–52 (S.D.N.Y. 2002).

Here, there is evidence in the record from which a jury might infer that substantial force was unwarranted despite Mrs. Chernick refusal to cooperate. It is undisputed that, at the time of

her arrest, Mrs. Chernick was a small woman, weighing approximately 110 pounds. SAC ¶ 27; Good Samaritan Medical Center Record, ECF No. 76-6 (indicating weight at the time of admission). While the officers testified that Mrs. Chernick "flail[ed]" or "wiggl[ed]" her limbs, Faya Dep. 69; Tramontana Dep. 55–56; Reyes Dep. at 139–40, they did not suggest that she attempted to hurt or harm them. Nor is there any suggestion that they feared she would be able to escape. Additionally, while two officers stated that they were concerned that Mrs. Chernick might have a weapon concealed near her waistband, Faya Dep. 56–57; Sweet Dep. 95; Defs.' Mem. 10, neither testified that they patted her down to assess whether she was armed. *See* Pl.'s 56.1 Response ¶¶ 78, 91; Faya Dep. 57; Sweet Dep. 95. These facts may very well bear on a jury's evaluation of the officers' credibility and the reasonableness of their perceptions.

Construing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that at least one of the officers applied the force that broke Mrs. Chernick's arm, and that such force was excessive, notwithstanding her refusal to cooperate. Accordingly, it must be left for the jury to determine what happened during Mrs. Chernick's arrest and whether the officers' actions were reasonable.

### D. Qualified Immunity.

Defendants' argument that the officers are entitled to qualified immunity also fails, because it too relies on the disputed question of how much force was applied to Mrs. Chernick's arm.

I may grant summary judgment on qualified immunity grounds only if I conclude that (1) Mrs. Chernick's asserted rights were "not clearly established" or (2) "the evidence is such that . . . no rational jury could fail to conclude that it was objectively reasonable for the [officers] to believe that they were acting in a fashion that did not violate a clearly established right." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (internal quotation marks and citation omitted). "In the event that

there are triable disputes as to the circumstances that could dictate whether the defendants could reasonably believe that [their] conduct was lawful, summary judgment based on an immunity defense must be denied." *Walker v. Carrozzo*, 664 F. Supp. 3d 490, 551 (S.D.N.Y. 2023) (internal quotation marks and citation omitted). "The same factual issues that preclude summary judgment on an excessive force claim" often preclude a determination that officers are "entitled to qualified immunity with respect to those same claims." *Taylor v. City of Rochester*, 458 F. Supp. 3d 133, 145 (W.D.N.Y. 2020).

Here, any assessment of whether the officers reasonably believed that the level of force they used was reasonable turns on how much force they actually used. It is true that the existence of disputed factual issue does not always preclude a granting of qualified immunity. *See Brown v. City of New York*, No. 13-CV-1018, 2016 WL 1611502, at *6 (S.D.N.Y. Apr. 20, 2016), *aff'd*, 862 F.3d 182 (2d Cir. 2017) (collecting cases). In cases where there is "no clear law" prohibiting the officer's conduct *regardless* of whose version of events is true, a motion or qualified immunity need not "await jury resolution of disputed factual issues." *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016). This is not one of those cases. At the time of Mrs. Chernick's arrest, "the use of excessive force in handcuffing was prohibited by clearly established constitutional law." *Cugini v. City of New York*, 941 F.3d 604, 615 (2d Cir. 2019).

Taking the facts in the light most favorable to plaintiff, a jury could conclude that an officer twisted Mrs. Chernick's arm so hard that it broke, such that it would be unreasonable for that officer to think his conduct was constitutionally permissible. Accordingly, I am unable to grant summary judgment on qualified immunity grounds.

## II. Summary Judgment is Granted on the Municipal Liability Claim.

Plaintiff's municipal liability claim concerns Suffolk County's alleged failure to train its officers in safe arrest protocols. SAC ¶¶ 62–70. Under the *Monell* doctrine, a local government may be held liable under section 1983 where the government's "policy or custom" causes a municipal employee to violate a plaintiff's rights. *See Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020) (discussing *Monell v. Dep't Soc. Servs. of NYC*, 436 U.S. 658 (1978)). Here, plaintiff alleges that the county's "failure to train police officers to safely subdue arrestees who pose no threat of flight or danger" constitutes an "unconstitutional policy" that led to a violation of Mrs. Chernick's constitutional rights. SAC ¶¶ 67–68.

Defendants argue that discovery has not borne evidence to support plaintiff's *Monell* claim. Defs.' Mem. 3. Plaintiff does not contest this assertion in his opposition papers, nor does he present any evidence concerning Suffolk County's training process or supervision procedures. Without any evidence to support the allegations in the SAC, plaintiff's *Monell* claim cannot survive summary judgment. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[C]onclusory allegations . . . are not evidence and cannot by themselves create a genuine issue of material fact[.]" (internal quotation marks omitted)). Therefore, I grant defendants' motion for summary judgment on plaintiff's claims against the County.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on the excessive force claim against the individual officers is DENIED. Summary judgment is GRANTED on the municipal liability claim against Suffolk County.

SO ORDERED.

 /s/ Allyne R. Ross
Allyne R. Ross
United States District Judge

Dated:      October 2, 2024
            Brooklyn, New York