UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
IRA CHERNICK as Administrator of the
Estate of MARYANN OST CHERNICK,

**Docket No.: 19-CV-7093(ST)**

Plaintiff,

-against-

POLICE OFFICER JESUS FAYA,
POLICE OFFICER ARGAND REYES,
POLICE OFFICER MICHAEL SWEET,
POLICE OFFICER CHARLES
TRAMONTANA individually, OFFICERS
"JOHN DOE" 1-2 (fictitiously named)
individually, and THE COUNTY OF SUFFOLK,

Defendants.
-------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A NEW TRIAL PURSUANT TO FRCP 59(a)

**HARFENIST KRAUT & PERLSTEIN, LLP**
*Attorneys for Plaintiff*
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
(516) 355-9600

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... i

PRELIMINARY STATEMENT ................................................................................1

THE TRIAL ...............................................................................................................3

    I.    THE CHASE.................................................................................3

    II.    THE INCIDENT IN THE DRIVEWAY ......................................4

        A.    Officer Tramontana's Testimony .................................4

        B.    Officer Faya's Testimony..............................................5

        C.    Officer Sweet's Testimony...........................................6

        D.    Officer Reyes' Testimony ............................................6

        E.    Officer Amato's Testimony...........................................7

        F.    Dr. Mostafavi's Testimony - Orthopedic Surgeon.......................................8

        G.    Dr. Luchs - The Estate's Expert ...................................9

        H.    Dr. Lastig - Defendants' Expert ...................................9

    III.    THE ESTATE'S THEORY ...........................................................10

    IV.    THE JURY CHARGE ..................................................................11

ARGUMENT..............................................................................................................12

POINT I    THE COURT INCORRECTLY REFUSED TO CHARGE THE JURY THAT THE ESTATE NEED NOT PROVE WHICH OF THE DEFENDANT OFFICERS BROKE OST'S ARM.............................................12

    I.    THE ESTATE DID NOT HAVE TO PROVE WHICH OFFICER DID WHAT ...............................................................13

POINT II    THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND CONSTITUTES A MISCARRIAGE OF JUSTICE...............19

CONCLUSION.............................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Branen*
    17 F.3d 552, 556 (2d Cir. 1994) ........................................................................... 12, 15

*Antevski v. Volkswagenwerk Aktiengesellschaft*
    4 F.3d 537, 540 (7th Cir. 1993) .................................................................................. 20

*Bey v. Roc*
    No. 19-CV-1877 (PKC) (JAM), 2025 WL 871648, at *12 (E.D.N.Y. Mar. 20, 2025) ....... 16, 17

*Blankenhorn v. City of Orange*
    485 F.3d 463, 481 n.12 (9th Cir. 2007) ...................................................................... 17, 18

*Boyd v. Benton County*
    374 F.3d 773, 780 (9th Cir. 2004) .............................................................................. 17

*Busch ex rel. Estate of Busch v. City of New York*
    224 F.R.D. 81 (E.D.N.Y.2004) .................................................................................. 24

*Caruolo v. John Crane, Inc.*
    226 F.3d 46, 54 (2d Cir.2000) .................................................................................. 19

*Cuellar v. Love*
    No. 11-cv-3632, 2014 WL 1486458 (S.D.N.Y. Apr. 11, 2014).................................... 15

*De Michele v. of City New York*
    No. 09-cv-9334, 2012 WL 4354763, at *16-17 (S.D.N.Y. Sept. 24, 2012)............................ 16

*DLC Mgmt. Corp. v. Town of Hyde Park*
    163 F.3d 124, 133 (2d Cir.1998) .............................................................................. 19

*Emamian v. Rockefeller Univ.*
    971 F.3d 380, 388 (2d Cir. 2020) .............................................................................. 18

*Girden v. Sandals Int'l*
    262 F.3d 195, 203 (2d Cir. 2001) .............................................................................. 12, 14

*Gonzalez v. Waterbury Police Dept.*
    199 F.Supp.3d 616, 621 (D. Conn. 2019) .................................................................. 16, 18

*Gordon v. New York City Bd. of Euc.*
    232 F.3d 111, 116 (2d Cir. 2000)............................................................................... 12

*Graham v. City of New York*
    128 F.Supp.3d 681, 693 (E.D.N.Y. 2015) .................................................................. 12

*Hamilton v. City of Peekskill Police Dep't*
    No. 13-cv-8138, 2015 WL 4635692, at *3 (S.D.N.Y. Aug. 3, 2015)........................................ 17

*Harrison v. United States*
    7 F.2d 259, 262 (2d Cir.1925) .................................................................................. 20

*Isley v. Motown Record Corp*
    69 F.R.D. 12, 16 (S.D.N.Y. 1975) ............................................................................ 20

*Jeffrys v. Rossi*
    275 F. Supp. 2d 463, 475 (S.D.N.Y. 2006) ................................................................ 15

*John v. City of New York*
    406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017) ................................................................ 17

*Manley v. AmBase Corp.*
    121 F.Supp.2d 758, 773 (S.D.N.Y.2000) .................................................................. 20

*Murray v. UBS Securities, LLC*
128 F.4th 363, 369 (2d Cir.2025) .................................................................................. 14
*Pahuta v. Massey-Ferguson, Inc.*
170 F.3d 125, 135 (2d Cir. 1999) ................................................................................. 12
*Patalano v. Am. President Lines*
250 Fed.Appx. 425, 427 (2d Cir. 2007) ....................................................................... 12
*Provost v. City of Newburgh*
262 F.3d 146, 154 (2d Cir. 2001) ................................................................................. 15
*Ricciuti v. N.Y.C. Transit Auth.*
124 F.3d 123, 129 (2d Cir.1997) .................................................................................. 15
*Ricks v. O'Hanlon*
No. 07-cv-9849, 2010 WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010) ................................ 15, 16
*Ruffin v. Fuller*
125 F. Supp. 2d 105, 108–09 (S.D.N.Y. 2000) ......................................................... *passim*
*Russo v. DiMilia*
894 F.Supp.2d 391, 414 (S.D.N.Y.2012) ...................................................................... 15
*Shankle v. Andreone*
No. 06-CV-487 (NG)(LB), 2009 WL 3111761 at *5 (E.D.N.Y. Sept. 25, 2009) ................... 16
*United States v. Landau*
155 F.3d 93, 104 (2d Cir.1998) ............................................................................... 19, 20
*Universal Calvary Church v. City of New York*
2000 WL 1538019 at *16 (S.D.N.Y. Oct. 17, 2000) ...................................................... 16
*Worytko v. Cty. of Suffolk*
285 Fed.Appx. 794, 795 (2d Cir. 2008) ........................................................................ 12

**Rules**

FRCP 59 .................................................................................................................... *passim*

# PRELIMINARY STATEMENT

This case presents two distinct issues warranting that the Estate of Maryann Ost Chernick (the "Estate") receive a new trial under FRCP 59.

Initially, the Court refused to give the jury a legally correct and necessary instruction that the Estate need not prove which specific officer broke Maryann Ost Chernick's ("Ost") arm where the defendant officers, Police Officer Jesus Faya ("Faya"), Police Officer Argand Reyes ("Reyes"), Police Officer Michael Sweet ("Sweet"), Police Officer Charles Tramontana ("Tramontana") (collectively, "Defendants" or "Defendant Officers"), all admitted physical contact with her during the encounter. The Estate requested the instruction, supported it with authority, and preserved the issue through written submissions and extensive discussion at the charge conference.

The Court's refusal to provide the requested instruction because the case did not include a failure to intervene claim was error. The Court's ruling improperly heightened the Estate's burden and deprived the jury of the correct legal framework for evaluating liability, taking the failure outside of the realm of harmless error.

Secondly, the case is the rare circumstance in which the jury's verdict for the Defendants was manifestly unjust and against the weight of the evidence because it is irreconcilable with the undisputed medical evidence, the Defendant Officers' internally inconsistent and repeatedly shifting testimony, and the governing legal standards that should have been applied.

The trial record established - through the testimony of every medical professional, including Defendants' own expert - that Ost sustained a displaced spiral fracture of the humerus caused by a significant twisting force, not by a car accident, a fall, or any benign mechanism. Dr. Mostafavi, the surgeon who repaired Ost's arm testified that the injury could only be caused by a twisting force and that it would be "impossible" for an individual with such a fracture to operate a

1

motor vehicle, eliminating the possibility that the injury was caused before the encounter with the Defendants.

The Estate's expert, Dr. Luchs, independently confirmed that the fracture was caused by twisting or twisting-plus-impact forces and even Defendants' expert conceded the existence of a spiral fracture and offered no alternative explanation. No medical witness supported Defendants' theory that Ost's broken arm occurred before she encountered the Defendants.

Against this uniform medical evidence as the cause of Ost's injury, the Defendant Officers' testimony as to the manner of Ost's arrest was so contradictory, implausible, and self-serving that no rational jury could credit it. Initially, Tramontana claimed to be inches from Ost yet "did not see" what part of her body struck the ground and could not identify who handcuffed her.

Next, Faya changed his account repeatedly testifying at deposition that Ost "fell straight back" then at trial that she fell to her left contradicting his internal affairs interview in which he admitted Tramontana helped bring her down and reversing himself on whether Ost's car was running. He also claimed he feared for his safety due to the possibility that the flowerpot near the garage could have contained a weapon.

Sweet placed Ost's body in a location inconsistent with both Faya and Tramontana and his testimony about seeing the keypad and the garage door being open directly contradicted his deposition.

Reyes, like Faya, could not keep straight who handcuffed Ost, testifying differently at trial than at his deposition but that both were "correct" even though the two accounts were irreconcilable.

And Amato's account of the events was physically impossible - she claimed to have "approached the back of the Lexus" parked in the driveway even though it was undisputed that

2

Faya's vehicle was pressed against the Lexus's rear bumper, claimed to see nothing and did not see the bruising and scraping on Ost's face despite being the officer who searched her and went to the hospital with her.

These contradictions were not minor. They went to the core of what happened in the driveway, and they revealed a coordinated effort to obscure the truth. The only coherent, evidence-based explanation for Ost's injuries is the one supported by the medical testimony and the physical evidence which was presented by the Estate: Faya twisted Ost's right arm with sufficient force when bringing her to the ground causing a spiral fracture, and Sweet further displaced the fracture when he pulled her arm from beneath her body.

Because the jury was mis-instructed on a central legal issue, and because the verdict was against the overwhelming weight of the evidence, a new trial is required. Rule 59 exists precisely for cases like this—where the result is "seriously erroneous" and allowing it to stand would constitute a miscarriage of justice. The record here compels that conclusion.

## THE TRIAL

## I. THE CHASE

On the night of February 9, 2019, officers from the Suffolk County Police Department were notified that a vehicle struck a building in Deer Park and subsequently fled the scene. (Tr. p. 36-37)[1]. That vehicle was driven by Ost. (Tr. p. 60). The vehicle was then observed on Deer Park Avenue traveling northbound. (Tr. p. 41). Officers pursued the vehicle as it entered the Long Island Expressway. (Tr. p. 43). The vehicle was allegedly swerving. (Tr. p. 43). Multiple officers were in pursuit of the vehicle at this point. (Tr. p. 44). The vehicle traveled into Nassau County and eventually exited the Long Island Expressway and continued westbound on the service road. (Tr.

---

[1] All references to the trial transcript shall be cited as "Tr. p. __". The relevant portions of the trial transcripts are annexed to the Declaration of Steven J. Harfenist dated April 9, 2026.

p. 44). The vehicle was driving at normal speeds of 60-70 MPH on the expressway and 50 MPH of the service road. (Tr. p. 124). Ost eventually turns into her residential community off the service road and drove through the gate of the community. (Tr. p. 46-47). Ost then drove through the community to her house and eventually pulled into her driveway. (Tr. p. 51).

## II. THE INCIDENT IN THE DRIVEWAY

The testimony of the officers actively involved in the apprehension and arrest of Ost was so internally inconsistent, contrary to prior testimony or simply unbelievable as to the physical encounter with her that no rational jury could credit it. To make matters worse, the expert testimony of the medical professionals, including the Defendants' own expert, only supports the the Estate's theory as to how Ost's arm was broken.

### A. Officer Tramontana's Testimony

Tramontana apprehended Ost first when she was at the keypad to her garage in her driveway. (Tr. p. 59). Then Tramontana "bumped" her, and she banged into the garage door to the right. (Tr. p. 63-64). At this point, she was still standing. (Tr. p. 66). Shortly thereafter, Tramontana states that Faya approached and then pulled Ost to the ground. (Tr. p. 69). Conveniently, while standing within inches of Ost, Tramontana did not see what part of Ost's body Faya grabs (Tr. p. 74) and has "no idea" which part of Ost's body hits the ground. (Tr. p. 74). Tramontana does remember Ost was on the ground in front of her car near the garage door. (Tr. p. 78). Tramontana testified that he did not see who handcuffed her, he was holding her leg, but he believes Reyes handcuffed Ost. (Tr. p. 84).

4

**B.** **Officer Faya's Testimony**

Faya testifies that when he arrived, Tramontana was to his left and Ost was also to his left facing the garage. (Tr. p. 210-212). Faya then says he "pulled and pushed" Ost down to where she falls on her left side. (Tr. p. 212-213). Then when asked to agree that his recollection was better at his deposition (taken in 2021) he responded by saying: "Not necessarily. In getting ready for this case and intense preparations, I looked over a lot of exhibits and refreshed my recollections with a lot of other documentation and I have thought -- done more deep thinking about this incident." (Tr. p. 213).

Faya testified at his deposition that Ost fell straight back and down when he grabbed her. (Tr. p. 215). He attempted to correct his testimony by saying the question asked at the deposition wasn't clear. (Tr. p. 215).  Faya stated he did not recall Tramontana helping him bring Ost to the ground. (Tr. p. 224). This statement was inconsistent with his internal affairs interview which took place on May 30, 2019, just 3 months after the incident, when he stated that Tramontana *did* help him bring her to the ground. (Tr. p. 224-225).

Conspicuously, right before further questioning on the topic, Faya needed a break from his testimony. (Tr. p. 231). Faya had testified at his deposition that he handcuffed her left hand but didn't know who cuffed her right hand. (Tr. p. 258) At trial claimed he did not remember who handcuffed her. (Tr. p. 258).  This is wholly inconsistent with Tramontana, Reyes, and Sweet each saying that Reyes handcuffed Ost. (Tr. p. 258) *compare with* (Tr. p. 84), (Tr. p. 461), (Tr. p. 756-757).

Confusingly, Faya's memory got worse when it came to remembering who handcuffed Ost despite previously testifying that his memory had actually gotten better 7 years after the incident. (Tr. p. 213). At Faya's deposition in 2021, he stated Ost's car was not running when he got out of

the car, then at trial he said he actually remembers her car running after he exited his vehicle. (Tr. p. 405).

Faya also testified that he feared his safety during the encounter with Ost, who was five foot six and about one hundred pounds. (Tr. p. 424-425). He particularly testified that he was concerned that Ost might have a weapon in the flowerpots in front of her garage. (Tr. p. 424-425).

### C.    Officer Sweet's Testimony

Sweet states he saw Ost typing numbers into the keypad at the garage then next time he sees her she's on the ground. (Tr. p. 441). He also testified that her body was not in front of the car, but instead near the front left quarter panel of the car. (Tr. p. 446). This is inconsistent with Tramontana who states Ost was in front of her car, inconsistent with Faya who testified at trial that when he took her down, she fell to her left (Tr. p. 212-213) and also inconsistent with Faya's deposition where he stated Ost fell backwards. (Tr. p. 224-225). Sweet then testified that he put both of his hands around her right triceps to pull her arm out from underneath her body. (Tr. p. 453). Sweet then says he remembers Reyes getting ready to cuff Ost but wasn't sure if he ultimately handcuffed her. (Tr. p. 461).

Sweets entire testimony contradicts both of Faya's versions of the story were. Faya testified at his deposition that he handcuffed her left hand and Sweet handcuffed her right hand. (Tr. p. 258) then at trial Faya he cuffed her left hand and did not remember who handcuffed her right hand. (Tr. p. 258).

### D.    Officer Reyes' Testimony

Right away, Reyes struggled to explain who handcuffed Ost. (Tr. p. 754-756). When confronted with Faya's conflicting testimony and his own deposition testimony, he astonishingly testifies that his prior testimony was "correct." (Tr. p. 756).

At his deposition, Reyes testified that he handcuffed her and then at trial stated that he only handcuffed her right hand and Faya cuffed the left. (Tr. p. 756-757). When asked if his memory was better at is deposition, similar to Faya, Reyes says his memory was better at trial then it was five years prior. (Tr. p. 757).

Specifically, when asked if he has a better memory after preparing for trial Reyes responds, "like everyone else, yes." (Tr. p. 757). Reyes also admitted that each of the Defendants prepared for trial all together at certain times. (Tr. p. 757). Reyes proceeded to confirm that he has a vivid memory of a random statement made by Ost (which coincidentally supports himself and the Defendants) in the hospital yet no recollection of who was where and what they were doing when the incident occurred in Ost's driveway. (Tr. p. 844-845).

### E.    Officer Amato's Testimony

When Amato arrived at Ost's house, Amato stated Ost was already on the ground and notably did not remember which side of the driveway she was on when she arrived. (Tr. p. 913-914). Amato testified that when she walked up the driveway, she "approached the back of the Lexus." (Tr. p. 914). Amato also testified that she "knew she was on the ground, but [] didn't have a clear view." (Tr. p. 915).

Most troubling with Amato's testimony is that it was physically impossible to approach the back of the Lexus while it was in the driveway as it is undisputed that Faya's car was pressed up against the rear bumper of the Lexus. (Tr. p. 203). Amato then states that she didn't see any abrasions or injuries on Ost's face despite being face-to-face with Ost when she searched her. (Tr. p. 917). Also troubling is that Amato admits that she never witnessed Ost resisting arrest and when she wrote down that she did witness Ost resisting arrest it was allegedly based on information that she obtained from Faya and Tramontana. (Tr. p. 925, 929-930).

But most troubling was that Amato, who searched Ost and accompanied her to the hospital, did not recall seeing the extensive bruising on Ost's face. (Tr. p. 917-918). That was simply impossible.

**F.      Dr. Mostafavi's Testimony - Orthopedic Surgeon**

The testimony of Ost's treating orthopedic surgeon, Dr. Mostafavi, established the severity, mechanism, and timing of Ost's injury in a manner that was both consistent with the Estate's account and incompatible with any alternative explanation. Dr. Mostafavi testified that it would be "impossible" for an individual with a displaced spiral fracture of the humerus to operate a motor vehicle (Tr. p. 554) which swiftly dismisses the argument posited by the defense that Ost broke her arm in a "car accident" that resulted in no damage to anything or anyone. Dr. Mostafavi further explained that such a fracture can worsen in displacement as a result of additional trauma (Tr. p. 555) i.e., when Sweet pulled Ost's right arm with "significant effort." (Tr. p. 454).

He described Ost's injury as far from minimal, stating: "It's not a minimally displaced — essentially all of the soft tissues covering the humerus are torn, it bled, and you have a large hematoma" (Tr. p. 566-567), and noted that Ost presented with "ten out of ten pain" upon his initial examination (Tr. p. 569). During surgical intervention, he directly observed a spiral fracture of the humerus (Tr. p. 572).

Critically, Dr. Mostafavi opined that the nature of the injury was not consistent with the type of trauma one would expect from a car accident (Tr. p. 584–587), and confirmed that Ost's bones were not osteopenic, eliminating any suggestion that the fracture resulted from underlying fragility (Tr. p. 596). Taken together, this uncontroverted medical testimony established a significant traumatic injury inconsistent with Defendants' version of events and strongly corroborative of the Estate's account of force.

### G.      Dr. Luchs - The Estate's Expert

The testimony of the Estate's expert, Dr. Luchs, independently confirmed and reinforced the opinions of the treating surgeon, Dr. Mostafavi, regarding both the mechanism and timing of Ost's injury. Dr. Luchs explained that a fracture with an oblique spiral orientation is caused by a twisting force, or a direct impact combined with twisting (Tr. p. 703), and identified radiographic features consistent with such a mechanism, including "peaking to the edges of the fracture," which he described as a hallmark of a spiral fracture (Tr. p. 704).

Demonstrating the fracture to the jury, he noted that the fracture edge resembled a "ski slope," spiraling up and around the bone further confirming the presence of a spiral fracture (Tr. p. 708–711). Consistent with Dr. Mostafavi's testimony, Dr. Luchs found no evidence of osteopenia (Tr. p. 713, 747), and explained that osteopenic bone would not be capable of holding surgical screws (Tr. p. 717–718). Thus, any suggestion that the fracture resulted from underlying bone fragility should be disregarded.

He further opined, again in agreement with Dr. Mostafavi, that the fracture was not consistent with an automobile accident or a fall (Tr. p. 723–725). Dr. Luchs' testimony corroborated Dr. Mostafavi's findings and provided a clear, consistent medical explanation that the injury resulted from a significant twisting force applied at or around the time of the incident.

### H.      Dr. Lastig - Defendants' Expert

Even Defendants' own expert, Dr. Lastig, failed to offer testimony meaningfully supporting Defendants' position and, in key respects, corroborated the conclusions of both Dr. Mostafavi and Dr. Luchs. Dr. Lastig testified that he would not dispute Dr. Mostafavi's findings that Ost sustained a spiral fracture (Tr. p. 1098–1100), thereby conceding the fundamental nature and mechanism of the injury as described by Ost's treating physician and expert.

As such, Defendants' own expert did not refute the existence of a spiral fracture, nor did he establish any alternative explanation grounded in bone fragility, leaving unrebutted the consistent medical evidence that Ost's injury resulted from a significant traumatic twisting force.

## III.    THE ESTATE'S THEORY

In his closing statement, the Estate's counsel presented the following scenario to the jury which based on the testimony of the officers, physical evidence, and expert testimony, shows that the officers' version of the events leading up Ost being assaulted was utterly devoid of credibility:

Let me walk you through this because this is what really happened. I can't tell you whether Officer Tramontana bumped her away from the keypad or not or where he was until everybody agrees he was holding her legs down, and that doesn't matter. But here's what I can tell you. Officer Faya didn't pull her to his left. What he did was he grabbed her by her right arm and twisted her and threw her on to the ground and she landed on her left side. Because if he did it the other way, grabbed her by her shoulder and waist and turned her onto the left, she would have either banged into Officer Tramontana and went into the bushes. The only way it could have possibly happened was he came running up there, they were aggravated, she led them on a chase, and he grabbed her by that arm, pulled and pushed her, pulled and pushed her by that arm and threw her on the ground and she landed like this. On the left side of her body on the ground. That doesn't explain at this juncture how she got all of the bruises on the right side of her face. That happened either while she was being dragged around to the ground and flipped over, or it happened after, but we've heard multiple versions of the, I never saw that, I never saw that. We used to call it the Helen Keller defense; can't see, can't hear, but I can tell you I didn't do it. So he twists her turns her around now Officer Sweet comes.
Well -- and we now know that he hasn't gotten his story straight about whether he did it by himself, the fact that the car was running or wasn't, and the story how she got on the ground is completely implausible. Now Officer Sweet comes and he comes running up the other side of the car. Now, I'm not sure if that was possible. And I'll tell you why. Because the right side of the car, the Lexus, we looked at the picture, the Lexus it was a big car, we all know that the keypad is on the left, right? He's coming up the right side of the car, he wouldn't see that keypad until he was almost upon her. And by then Officer Tramontana would have been able to just take her into custody with Officer Faya. So -- but I'm going to take what he says at face value right now on this point. He says, and this is -- that he saw Ms. Chernick by the keypad, but couldn't see if she was punching in the numbers because her back was to him. That's what he testified here. And by the time he got there, she was face down on the ground. So that would explain how her face got all beat up because it's clear that those bruises were from the driveway. Okay. He then says while he's on the ground, he pulled her right arm out from under her in an attempt to handcuff

her. What did he say in 2021 before they had their little study club? He said Ms. Chernick successfully punched in the key code on the keypad and the garage door opened. That's what he said. Why would you say that? The garage door never opened. Well, it gets back to this whole fear of their safety thing. The garage door open, she might have run in, they have the right to use more force. That's not what they say, because they can't keep their stories straight because they're not telling you what necessarily really happened. He testified at his deposition that she got the door open. He actually could see her punch the numbers in. Which version should you believe? The one after they got together and figured out what to tell you guys or before that necessarily happened and they sat at a deposition. Or did their deep study, let them remember something now. Why is that issue so important? Because if he was able to see her and see that the garage door opened and she punched the keys in, if he was coming from the right side, he was right there on top and she was already on the ground at that point. He says he pulled her arm out for the purposes of handcuffing her, but he never did.

Tr. p. 1259-1262.

Here, the Estate's theory of what happened to Ost is simple, Faya broke her arm and Sweet further displaced the fracture as he pulled it. The theory is supported by the evidence adduced at trial. The Defendants repeatedly told stories that were fabricated. That should not go unnoticed.

## IV. THE JURY CHARGE

Before the charge conference, counsel for the Estate provided the Court with a proposed charge along with authority supporting that the the Estate need not identify which officer did what in order to prove the excessive force claim. (ECF No. 115). At the charge conference, counsel for the Estate argued for the inclusion of two specific charges that the Court ultimately decided to exclude from the instructions. Certain portions of the proposed instructions were included while others were excluded. The following relevant portions in **bold** were ultimately excluded:

> The plaintiff may establish an officer's personal involvement through facts suggesting that the officer was personally involved in the use of force. **But the plaintiff need not establish who, among a group of officers, directly participated in the excessive force to satisfy direct participation.**
>
> In reaching this conclusion you are permitted to use the testimony of multiple individuals to infer that particular officers were liable for the alleged conduct, **even if the plaintiff cannot tie a particular officer to a particular action.**

Tr. p. 1179-1180.

The Court should have permitted the proposed instructions that explained to the jury that the the Estate need not prove which officer specifically engaged in the constitutional violation, which is well-settled for excessive force claims in this Circuit.

## ARGUMENT

## POINT I

**THE COURT INCORRECTLY REFUSED TO CHARGE THE JURY THAT THE ESTATE NEED NOT PROVE WHICH OF THE DEFENDANT OFFICERS BROKE OST'S ARM**

Among the grounds for granting a new trial under Rule 59 is a finding that a jury instruction was erroneous and that the error was not harmless. *Graham v. City of New York*, 128 F.Supp.3d 681, 693 (E.D.N.Y. 2015); *See also Gordon v. New York City Bd. of Euc.*, 232 F.3d 111, 116 (2d Cir. 2000); *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994); *Worytko v. Cty. of Suffolk*, 285 Fed.Appx. 794, 795 (2d Cir.2008).

Jury instructions are intended to give the jury a clear and concise statement of the law applicable to the facts of the case. *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)).

However, since trial judges have "considerable discretion in the formulation and style" of their jury charges, *Patalano v. Am. President Lines*, 250 Fed.Appx. 425, 427 (2d Cir. 2007) (Summary Order), an instruction is erroneous, and a new trial warranted, if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law. *See Anderson*, 17 F.3d at 556 (citations omitted).

"A court's charge must be tested by viewing it as a whole and will not be disturbed if it is 'correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it.'" *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 135 (2d Cir. 1999) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 552-53 (2d Cir. 1996)).

**I.     THE ESTATE DID NOT HAVE TO PROVE WHICH OFFICER DID WHAT**

Here, the Court refused to charge the jury that the Estate need not specifically identify which of the three officers, all of whom admitted physical contact with Ost, caused the break in her arm after the Estate specifically requested the charge. This was error.

Following the Court providing its draft jury instructions, the Estate provided the Court with a proposed charge along with a letter dated March 8, 2026, (ECF No. 115) addressing the authority that Estate believed supported charging the jury as to whether the Estate was required to prove the specific officer that broke Ost's arm and caused the lacerations among the Defendants who all admitted placing their hands on her.

The Court and the parties extensively discussed the instruction and the authority that the Estate believed supported giving the charge at the charging conference.  The Court agreed to provide a portion of the proposed charge but declined to provide the complete charge. (Tr. p. 1179).

The Court included a portion of the proposed charge that addressed the concept of "direct participation" but the Court declined to give the aspect of the proposed charge that explained the Estate didn't need to identify the specific officer(s) that caused Ost's injuries. (Tr. p. 1179).

Specifically, the Court included, "In reaching this conclusion you are permitted to use the testimony of multiple individuals to infer that particular officers were liable for the alleged conduct," but refused to provide the following aspect of the charge, "even if the plaintiff cannot tie a particular officer to a particular action." (Tr. p. 1179-1180).

Similarly, the Court included, "[t]he plaintiff may establish an officer's personal involvement through facts suggesting that the officer was personally involved in the use of force[,]" but refused to provide the following aspect of the charge, "[b]ut the plaintiff need not

establish who, among a group of officers, directly participated in the excessive force to satisfy direct participation." (Tr. p. 1179).

In refusing to provide this "identification" portion of the charge, the Court determined it was inapplicable and only controlled in cases where a plaintiff has asserted both an excessive force and failing to intervene claim (Tr. p. 1140). This was error.

The submission of the requested charge, the law the Estate asserted supported it and the extensive discussion at the charge conference was sufficient to preserve the error.

In the Second Circuit law, a request for a specific jury instruction, accompanied by a letter to the court explaining why the instruction should be given, is sufficient to preserve the objection - even where the court denies the instruction and the proposing party thereafter cooperates with the court in crafting an alternative. *Murray v. UBS Securities, LLC*, 128 F.4th 363, 369 (2d Cir.2025).

There was no need to make any further objection after the charge was given because it was futile. "[A] failure to object after a charge is given is excused where ... a party makes its position clear ... and the trial judge is not persuaded. A further attempt to object need not be undertaken [when] it would be without any reasonable possibility that the trial court would change its mind." *Girden v. Sandals Int'l*, 262 F.3d 195, 202 (2d Cir. 2001).

Contrary to the Court's conclusion, the law does not restrict the concept of when multiple defendant officers are involved in an incident with a plaintiff, the plaintiff must identify "who did what" among the officers solely to cases in which a plaintiff has asserted both an excessive force and failure to intervene claims.

A § 1983 excessive force claim does not fail merely because the plaintiff - here, deceased before she could testify - cannot identify which officer applied the force that caused her injury.

In excessive force cases, the Second Circuit has long held that officers may be liable either for direct participation in the use of force or for failing to intervene to stop it. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). While the claims are certainly different, they do not part ways on whether a plaintiff must identify which specific officer caused injury and which officer failed to intervene.

While direct participation and failure to intervene are independent theories of a § 1983 excessive force claim, neither the Second Circuit nor any district court in this Circuit has held that an excessive force claim, unlike a failure to intervene claim, requires direct identification of the officer who caused a specific injury.

It goes without question that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001); *Ricks v. O'Hanlon*, No. 07-cv-9849, 2010 WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010)

"A police officer is personally involved in the use of excessive force if he [or she] either: (1) directly participates in an assault; *or* (2) was present during the assault yet failed to intercede on behalf of the victim even though he [or she] had a reasonable opportunity to do so." *Russo v. DiMilia,* 894 F.Supp.2d 391, 414 (S.D.N.Y.2012) (internal quotation marks omitted); *See also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997).

"Of course, where the officer is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable." *Cuellar v. Love,* No. 11-cv-3632, 2014 WL 1486458 (S.D.N.Y. Apr. 11, 2014).

Courts in this Circuit have held that a plaintiff need not identify "which officers did what" out of a group of officers. *Jeffrys v. Rossi*, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2006). The principle

is not limited to only those cases where a failure to intervene claim is presented. *Ricks v. O'Hanlon*, No. 07 CIV. 9849 (WHP), 2010 WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010) (notably, an arrestee's inability to positively identify those who allegedly violated his rights is "not *per se* fatal to his claims") (cleaned up); *Universal Calvary Church v. City of New York*, 2000 WL 1538019, at *16 (S.D.N.Y. Oct. 17, 2000) ("[T]he burden of identifying by name and badge number every police officer who allegedly participated in the incident cannot be placed on [the] Plaintiff ..."); *See also Shankle v. Andreone*, No. 06-CV-487 (NG)(LB), 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009).

This principle is especially important where, as here, the plaintiff is unable to provide testimony from the victim and the officers are the only living witnesses. *Gonzalez v. Waterbury Police Dept.*, 199 F.Supp.3d 616, 621 (D. Conn. 2019) ("A plaintiff seeking to prove that an officer directly participated in the alleged excessive force **need not be able to positively identify, at trial, which defendant took what particular action**.") (emphasis added) (citing *Medina v. Donaldson*, No. 10-cv-5922, 2014 WL 1010951 (E.D.N.Y. March 14, 2014).

As the court in *Bey v. Roc*, in which no claim for failure to intervene was asserted, stated:

> [To] show personal involvement as required to state an excessive force claim under Section 1983, a plaintiff need not ... positively identify which officers used the alleged excessive force against her to defeat a motion for summary judgment. Instead, a plaintiff must submit some sort of evidence that the defendant was present at the scene of the alleged assault. In this instance, the State Defendants, by their own admission, were on the scene at the time Plaintiff was placed in handcuffs. Thus, the State Defendants' argument that they cannot be liable due to a lack of proven personal involvement is unpersuasive.

2025 WL 871648, at *12. (cleaned up).

When several officers have physical contact with a plaintiff during the period in which the injury occurred, each officer may be held liable as a direct participant. *See De Michele v. of City New York*, No. 09-cv-9334, 2012 WL 4354763, at *16-17 (S.D.N.Y. Sept. 24, 2012)(denying

defendants' motion for summary judgment on excessive force claim where officers' presence at time of arrest was undisputed and events as plaintiff described them would have "prevent[ed] him for seeing which officers were taking what actions").

Put simply, a plaintiff need only produce evidence that the officer defendants were present on the night in question and participated in the act that led to the excessive force claim. A plaintiff does not have to specifically identify which defendant did what out of a group of officers *See Hamilton v. City of Peekskill Police Dep't*, No. 13-cv-8138, 2015 WL 4635692, at *3 (S.D.N.Y. Aug. 3, 2015) ("[a] reasonable jury could infer that [defendant officers] both perpetrated the attack because they conceded that they were the officers on the scene.") (only claims were excessive force and battery under state law and no failure to intervene claim was asserted); *Bey v. Roc*, No. 19-CV-1877 (PKC) (JAM), 2025 WL 871648, at *12 (E.D.N.Y. Mar. 20, 2025), *appeal dismissed* (June 9, 2025) (only excessive force claim); *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017).

While the Second Circuit has not directly addressed the issue, district courts have. Moreover, other Circuits have found that where multiple officers are involved in the use of force, the plaintiff need not identify the specific officer who caused the injury.

Under the Ninth Circuit's "integral participation" doctrine, "which does not require that each officer's actions themselves rise to the level of a constitutional violation," all the officers are liable even if they did not personally inflict the injury so long as they "participated in some meaningful way." *See Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004); *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).

Like in this Circuit, the "integral participation" doctrine requires more than mere presence, "[b]ut it does require some fundamental involvement in the conduct that allegedly caused the

17

violation[]" which does not require specific identification of which officer caused the injury. The "integral participation" doctrine is really nothing more than a different way of describing "direct participation". *Blankenhorn*, 485 F.3d at 481 n.12; *compare with Provost*, 262 F.3d at 154 (collecting cases).

Failure of the Court to provide an instruction regarding the "identity" issue improperly effects the plaintiff's burden. No case in this Circuit, or others, has held that the "identity" instruction is specifically limited to failure to intervene claims.

When the evidence shows that *all* of the defendants directly participated in the incident where the force was used, no failure to intervene claim would be sustainable. That would mean that where officers concede they were involved in an altercation where a plaintiff was injured (direct participation) but the plaintiff due to the circumstances could not identify which officer caused which injury, the plaintiff would have no claim. That is not the law in this Circuit.

Here, the failure to provide the proposed instruction was not harmless error. There can be no doubt that Ost's death made identification of who broke her arm more difficult. But this was compounded by the lack of instruction. While the Court did provide an instruction regarding direct participation, it did not specifically tell the jury that the Estate need not prove which of the Defendant Officers in the encounter actually broke Ost's arm. Failure to provide the instruction was incorrect.

Indeed, the failure to provide the instruction was plain error since it affected substantial rights, contravene an established rule of law, and "go to the very essence of the case." *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 388 (2d Cir. 2020). Had the jury been instructed that the Estate did not need to "positively identify, at trial, which defendant took what particular action" the jury would have returned a verdict in the Estate's favor. *Gonzalez*, 199 F.Supp.3d at 621.

18

Since the failure to include the proposed instruction that the Estate did not have to prove which Defendant Officer broke Ost's arm or caused the bruising and scraps to her face, this was error and a new trial is warranted.

**POINT II**

**THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND CONSTITUTES A MISCARRIAGE OF JUSTICE**

Rule 59 permits a district court to order a new trial "for any reason that would justify granting one on a party's motion." Fed. R. Civ. P. 59.

A new trial should be granted when "the jury has reached a seriously erroneous result or … the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir.1998) (quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992)). Thus, a new trial is warranted "when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp.*, 163 F.3d at 133 (citations omitted).

Indeed, the Second Circuit has stated that "[a] district court should grant a new trial if it is convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice." *United States v. Landau,* 155 F.3d 93, 104 (2d Cir.1998) quoting *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir.1988).

"[A] new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp.,* 163 F.3d at 134; *accord Caruolo v. John Crane, Inc.,* 226 F.3d 46, 54 (2d Cir.2000).

In evaluating a motion for a new trial, "a trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp.,* 163 F.3d at 134.

When weighing the evidence, the Court will necessarily consider the credibility of the trial witnesses. *See, e.g. Landau,* 155 F.3d at 104 ("It is inherent in the proposition that the district judge may weigh the evidence that the judge will consider the credibility of witnesses."). Of course, "[a] jury's credibility assessments are entitled to deference," and the judge may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* at 104–05.

"[P]rinciples of deference" do not, however, "override the trial judge's duty to see that there is no miscarriage of justice." *Landau,* 155 F.3d at 105 (internal quotations omitted); *See Manley v. AmBase Corp.,* 121 F.Supp.2d 758, 773 (S.D.N.Y.2000) (granting new trial); *Ruffin v. Fuller*, 125 F. Supp. 2d 105, 108–09 (S.D.N.Y. 2000) (same).

This is so, since the Court should not sit by when witnesses simply do not tell the truth. *Harrison v. United States*, 7 F.2d 259, 262 (2d Cir.1925) (stating that trial court may consider granting new trial if a witness recants); *Isley v. Motown Record Corp.*, 69 F.R.D. 12, 16 (S.D.N.Y. 1975) ("[I]t is the duty of the trial judge to set aside a verdict and grant a new trial if, in his opinion, the verdict is based upon evidence which is false…."); *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993) ("If a verdict is based on false testimony, the district judge has the discretion under Rule 59 to grant the injured party a new trial."). This is especially concerning since the false testimony came from police officers.

In this matter, it is hard to fathom how this group of police officers walked into court and told this story each riddled with their own internal inconsistencies and implausibility.

Moreover, convenient loss of memory, or in another instance, a better memory due to "studying" and not seeing things that were simply impossible not to see, should cause the Court to

not only be fundamentally disappointed in law enforcement officers but outraged that those who swore to protect and serve were more concerned with protecting each other.

The bottom line is that the testimony of the Defendant Officers in this case, when coupled with the uncontradicted medical evidence that Ost's arm could only have been broken by a twisting action, makes the jury's verdict an impossible outcome if they had reviewed the evidence in a dispassionate manner.

Two district court cases in this Circuit involving the grant of a new trial in excessive force cases show why the Court should order one in this case.

In *Ruffin v. Fuller,* 125 F.Supp.2d 105 (S.D.N.Y. 2000) the plaintiff alleged that, while incarcerated, he was assaulted by three officers. According to Ruffin, after ordering him to the floor following a verbal comment, two officers held him down while the defendant officer, Van Fuller, kicked him in the face approximately three to four times, with two of the kicks landing directly in his mouth and breaking his teeth. *Id*. at 106-107.

All three officers testified that the plaintiff instigated the confrontation, admitting that they took him down to the ground to control him. *Id*. at 107. However, all three officers denied that Fuller kicked Ruffin, and two of the officers speculated that Ruffin's mouth injury either occurred when he hit the floor or at some other time when he fell. *Id.* Videotape surveillance existed showing some, but not all of the encounter. *Id*.

Following a four-day trial, the jury returned a verdict finding for the defendant. *Id*. at 108 The court *sua sponte* granted a motion for a new trial pursuant to Rule 59(d) because **"**the jury's verdict was against the weight of the evidence presented at trial, and permitting the verdict to stand would result in a miscarriage of justice." *Id*. at 109.

In granting a new trial, the district court first relied on the lack of credibility of the officers. *Id.* at 110 ("Examining all the evidence presented at trial, including to some extent the credibility of the witnesses, it is clear the jury's verdict was against the weight of the evidence.") (emphasis added).

Secondly, and perhaps most importantly, the court in *Ruffin,* found that the expert evidence "convincingly" supported the plaintiff's version of events and contradicted the officers' version because the x-rays of his two cracked teeth showed that his injuries were "wholly consistent with multiple kicks to the mouth" and were "inconsistent ... with a fall on a flat surface." *Id.* at 109.

This case is remarkably similar to *Ruffin.* The officer's testimony lacked any credibility and some of it was implausible. Faya stated when he took Ost to the ground she went to her left and is unsure of how the right side of her face was covered in bruises and lacerations. (Tr. p. 210-215). It's implausible that none of the officers that night were able to determine how Ost suffered her injuries and, quite frankly, is completely contradicted by with the evidence of what occurred that night. The damage to her face, as seen below, was completely inconsistent with their story.



Defendant's Trial Exhibit O39.

Faya went as far as saying that he feared Ost had a gun in a flowerpot. (Tr. p. 424-425). Amato claims she didn't see anything despite having a clear line of sight (Tr. p. 914-915) or

22

remember Ost's serious injuries on her face despite being face-to-face when searching her. (Tr. p. 917).

Incredibly, Faya said his memory was better at trial than it was just months after the incident occurred back in 2019. (Tr. p. 213). Also, the newest version of how Ost was taken down just simply doesn't make sense. Tramontana bumps her (Tr. p. 63-64) then Faya "pulled and pushed" Ost down to where she falls on her left side. (Tr. p. 212-213). This of course contradicts the original version of events where Tramontana assisted in the takedown and Ost fell backwards. (Tr. p. 224-225). It could not have happened. The only way Ost could have wound up with her left portion of her face on the ground was if Faya pulled her arm and twisted her around. The Defendant Officers' testimony would have put her in the opposite direction essentially banging into Tramontano.

Sweet's testimony was no better. He testified that Ost's body was not positioned in front of the vehicle, but rather near the front left quarter panel (Tr. p. 446). This account conflicts with Tramontana's testimony that Ost was in front of the car, and with Faya's trial testimony that, when he took her down, she fell to her left (Tr. p. 212–213). It is also inconsistent with Faya's deposition testimony, in which he stated that Ost fell backward. (Tr. p. 224–225). Not to mention, in remains a complete mystery as to who handcuffed Ost. (Tr. p. 84, Tr. p. 258, Tr. p. 461, Tr. p. 756–757).

The Defendant Officers not only contradict themselves, but also the doctors who testified in this case, all of which agree that Ost suffered from a spiral fracture. (Tr. p. 572), (Tr. p. 703), (Tr. p. 1098–1100).

Like the plaintiff's broken teeth in *Ruffin*, uncontroverted expert evidence conclusively showed that Ost's broken arm was a spiral fracture caused by a twisting force. (Tr. p. 703). Even Defendants' expert did not refute this fact. (Tr. p. 1098–1100). This was consistent with the Estate's

theory of the case and contrary to the Defendant Officers – who seemingly blamed Ost's fracture and massive scrapes to her face on a car accident or fall. (Tr. p. 584–587).

Similarly, in *Busch ex rel. Estate of Busch v. City of New York,* 224 F.R.D. 81 (E.D.N.Y.2004), the decision to grant a new trial based on the officers' credibility was due in part to the existence of objective evidence contradicting the officer's version of events.

In *Busch,* Sgt. O'Brien, one of the officers who shot Busch testified that Busch was "very close to him when he fired" and another officer testified that "Busch was coming down on Sgt. O'Brien's head during the shooting." *Id.* at 95.

However, the defendants' ballistics expert, testified that Busch was five to eight feet away from the officers when he was shot, and the plaintiff's expert testified that "the absence of soot, stippling, or powder residue confirms that Busch was not shot at close range." *Id.*

Sgt. O'Brien also testified that he had pepper sprayed Busch after Busch had hit him numerous times with a hammer using "baseball swings", but pictures of Sgt. O'Brien taken shortly after the incident revealed only a slight abrasion on his wrist. *Id.*

Finally, the court also found that the civilian eyewitness testimony that Busch fell soon after being shot was more credible than that of the officers' testimony that he continued to advance because it was supported by the expert testimony.

Here, the Defendant Officers' bizarre explanations of how Ost came to the ground, the nature of her injury confirmed by expert testimony, selective memory and implausible lack of observations are equally persuasive to the evidence that warranted the district court in *Busch* to grant a new trial.

The circumstances in *Ruffin* and *Busch* are analogous to this case; the police officers testified falsely and circumstantial and medical evidence supported plaintiff's account. You don't

24

need to see it raining to know it rained. If you walk outside and the ground is wet and there are puddles everywhere, it rained.

In sum, the defendants' testimony in this case was not credible. No rational jury could have concluded they were telling the truth or that Ost's injuries occurred some from other encounter other than their arrest. The injury was painful and would have caused her arm to be dangling. The jury's verdict was against the weight of the evidence and a new trial is warranted to avoid a miscarriage of justice.

## CONCLUSION

For the foregoing reasons, the Estate of Maryann Ost Chernick should receive a new trial under FRCP 59.

Dated: Lake Success, New York
     April 9, 2026

                    HARFENIST KRAUT & PERLSTEIN, LLP

By:      *Steven J. Harfenist*
          Steven J. Harfenist
          Gustave Passanante
          *Attorneys for Plaintiff*
          3000 Marcus Avenue, Suite 2E1
          Lake Success, New York 11042
          T. (516) 355-9600
          F. (516) 355-9601
          E. sharfenist@hkplaw.com
          E: gpassanante@hkplaw.com